## **Exhibit E**

Bernard Carl's Response to Debt Collector

# 2340 Wyoming Avenue NW
# Washington, DC 20008

September 27, 2015

*By Post and Email*
Mr. G. Johnson
CAB
14226 Ventura Boulevard
Sherman Oaks, CA 91423

Re: Mindy Weiss Party Consultants, File # 0002001735

Dear Mr. Johnson:

I have received the claim you submitted on behalf of Mindy Weiss Party Consultants (MWPC) by your letter of August 31, 2015. I must advise you that I strongly disagree with this claim for several reasons. For clarity, let me say that I will sometimes refer to "we" or "us" in this letter. These are references to myself and my wife and/or the bride and groom, who, as you might expect, all played a meaningful role in the wedding event that MWPC was hired to help plan and coordinate.

## Aggregate Amount of Claim

Let's start with a relatively straightforward issue. You are asking for $4,109.44 in "interest." There is, however, NO provision for such interest in the MWPC consulting contract.

Second, the principal amount allegedly owed to MWPC (as described in your claim letter) is $326,075.22. However, in a notebook provided to me by MWPC at my request in August (the "MWPC Ledger"), MWPC showed the net amount owed to it as being $215,688.79 (plus a modest additional sum owed by the groom's family for the rehearsal dinner). Even with the rehearsal dinner sum included, the total claim at that time was less than $250,000, or $80,000 less than MWPC's current claim.

I assume that the difference is vendor bills that we disputed but MWPC paid anyway, without our authority or approval. These would include invoices from *Rock it Cargo* and *Images by Lighting*, but these only total $68,166.02, so still do not fully explain the amount claimed. Obviously, some further explanation is required.

1

## Contractual Issues

### Third Party Vendor Contracting and Payment

A large portion of the MWPC claim appears to relate to payments made on the contracts MWPC purported to have entered into on my behalf for a wedding event held in Southampton, New York on June 19-21, 2015. I had entered into the consulting agreement with MWPC at issue here in June 2014 in order to secure its assistance in planning and coordinating this event. This was purely a consulting contract, not a designation of MWPC to act as a general contractor.

The MWPC agreement did not provide MWPC with any authority to enter into contracts on my behalf. For example, the consulting agreement (¶5) specifies that "hiring any vendor is at the sole discretion ... of the Client" and that "[e]ach vendor contract [is to be] subject to review and approval by Client." But I was not even given the courtesy of a notice that MWPC, purporting to be my agent, had entered into several of the contracts that appear to be part of its claim. Nor was I offered copies of these contracts – even after they had been executed. In fact, when I later discovered that these contracts had been entered into, in contravention of MWPC's consulting agreement and without my authority, I tried to obtain copies. MWPC would not forward them to me and more than one vendor told me that I could not have those copies because MWPC had objected to the vendor's providing me with such materials. Thus, MWPC is seeking to be paid for contracts I never approved, often had no chance to review and, in some cases, still have not even seen.

To reiterate, MWPC's contract (¶5) makes the limitations on its authority to enter into such contracts very clear. It says that, "MWPC is to recommend vendors," and "to assist in negotiations with vendors if desired by Client," but warns that "hiring any vendor is at the sole discretion ... of the Client." It goes on to explain that "[e]ach vendor contract [is to be] subject to review and approval by Client." As if this contract provision were not clear enough, I had specifically warned MWPC, by both phone and email, that it had no authority to enter into contracts on my behalf because of the limited liability provisions in MWPC's own contract. I was unwilling to risk unintentionally extending this limitation to any other vendors whose services might pose more risks than that of a planning consultant. Both the contract and my warning were apparently ignored.

MWPC's entering into contracts with liability limitations or other terms to which I objected not only violated its contract, my instructions and my insurer's requirements but also put me at risk. It now appears that these contracts may also have the effect of denying me remedies I might otherwise have had against certain of the vendors with whom MWPC signed contracts.

The MWPC contract did not provide any authority for MWPC to incur liabilities on my behalf without my approval. Nor did that agreement provide any authority for MWPC to make

2

payments or assume liability on my behalf without my approval. Yet, MWPC appears to have done just that. Its claim includes several such vendor bills, including substantial bills to a lighting contractor (*Images by Lighting*) and trucking company (*Rock it Cargo*). It was my intention to dispute these (and potentially other vendor) bills, both challenging the amounts claimed and asserting potential counterclaims for damages. However, if MWPC has already paid these bills, allegedly on my behalf but without my authorization, approval or even knowledge (at least until after the fact), it will have seriously prejudiced my ability to dispute these vendors' claims. It may have similarly prejudiced my rights by including these invoices within its own claim even if it has not yet made payment, unless it is willing to accept, as its own and without limitation, whatever defenses or counterclaims I might assert with regard to these vendors.

Including these disputed vendor bills within its own contractual payment demand could easily be seen as an unjustifiable attempt to circumscribe my remedies against some of MWPC's favored West Coast vendors. While the MWPC (¶5) contract does say that MWPC should, at the client's request and direction, "assist in negotiations with vendors," that limited mandate would not seem to include accepting or paying disputed bills in full without even consulting its client.

**Contractor Selection**

As mentioned above, MWPC's contract (¶5) does require "MWPC to recommend vendors," and "to assist in negotiations with vendors if desired by Client." MWPC's clear mandate was to secure and provide competitive bids to me on a timely basis for the vendor services it recommended we retain. However, MWPC recommended only its favored vendors and made no effort to negotiate any of their prices. In fact, when I questioned the bid from one of those favored bidders, the response I got from MWPC was that MWPC had a long relationship with that vendor and believed it was entitled to charge whatever its principal thought he needed to make his desired profit. No alternatives were provided. Even when directly asked, MWPC failed to provide alternative bids for most of the significant services for which it later entered into contracts with its favored vendors. This kind of cozy relationship hardly met the mandate for MWPC to provide "bids" for me to review (the plural suggesting competitive bids were required) or otherwise to help me in negotiating favorable prices and terms with our vendors. It quickly became clear that MWPC was far more interested in protecting the profits of its favored vendors than the budget of its client.

**Budgets**

The MWPC contract, in requiring that alternative vendors be identified, clearly anticipated that I would be able to control the costs of the event for which MWPC's planning services were being retained. In contrast to that clear intention, and despite my repeated and increasingly urgent requests, after signing the MWPC consulting agreement on June 6, 2014, MWPC did not present a proposed budget for the event for over ten months — until barely more than a month before the

3

scheduled date of the wedding. By that time, it was far too late to make meaningful adjustments to the budget or to find alternative vendors for many of the services identified in that budget. The cost of the event ended up escalating to a multiple of what I had budgeted, in large part because MWPC's plan and its inflated budget were presented to us too late to make needed changes – despite all the prior requests to receive these materials on a more timely basis.

Even when I finally got the budget, I did not get copies of any of the back-up presentations by vendors or even the identities of many of those vendors. This lack of transparency added to the problems. For example, I did not receive the proposed bid of the tent rental company until barely two weeks before the wedding, at which time I had hurriedly to review and try to modify the vendor's proposal as best I could at the last minute.

**Lack of Transparency**

MWPC's lack of transparency manifested itself in other ways, as well. When we asked for floor plans for the reception spaces, we got them late and in an almost unusable format, making needed (and potentially cost-saving) changes difficult if not impossible.

My repeated requests for a list of the personnel that would be on site from both MWPC and the major vendors, and of their respective duties, were repeatedly dismissed and this information was never provided – and still has not been. That schedule could also have been a valuable tool in controlling costs – if it had ever been forthcoming.

I also asked MWPC to identify, for me, any overlapping ownership interests among MWPC (or its principals) and the vendors it was recommending. I have never gotten any response. I asked this because I discovered – after the fact and from Instagram – what appeared to be potential overlapping ownership interests between MWPC and the printing vendor it recommended. Surely, any such potential conflicts of interest should have been voluntarily disclosed sooner.

Additionally, I asked MWPC to identify any commissions, payments, concessions or other financial considerations it has recently received from (or been offered by) any of the vendors it recommended. I asked this because I was told that a ten percent commission, whether in cash or in kind, is commonly offered by less scrupulous vendors in this sector in order to secure overpriced contract business. Again, I have gotten no response. I think I should be entitled to this kind of information, but there seems to have been a continuing lack of transparency about the relationships between MWPC and its preferred vendors as well as about the vendor selection process in general.

MWPC's lack of transparency also frustrated another of my goals. I had repeatedly explained to MWPC that I wanted to use local vendors whenever possible to be supportive of businesses in my own community. When MWPC's preferred vendors were finally identified, I learned that

4

several of the larger contracts were going to firms from California that had long term relationships with MWPC. I was extremely disappointed; however, by then, it was already too late to substitute alternative local sources or to avoid the considerable expense of bringing staff and goods all the way across the country to provide services for a three-day event when the same services should have been available from more local sources. In fact, I saw no evidence that MWPC had made any meaningful effort to locate local vendors to substitute for any of their long-term West Coast-based vendors. And, I still find it hard to believe that no lighting contractor or furniture rental company in the northeast could have properly serviced this project.

### Vendors

Not only did MWPC fail to identify alternative local vendors, it actually frustrated that process. In at least one and possibly other cases, MWPC interfered directly with my efforts to locate and retain local vendors at far lower costs than the West Coast vendors MWPC had identified in its budget proposal and with whom it had pre-existing relationships. That was clearly the case with the lighting contractor proposed by MWPC. An MWPC employee warned a local vendor that I had recruited not to get involved in our project or to interfere with the contract of MWPC's favored West Coast-based lighting vendor. Ironically, that West Coast vendor used another local tradesman for much of its work anyway, and simply marked-up the local vendor's services. Neither the primary vendor nor MWPC advised me of that mark-up or suggested to me that I could have purchased the same services locally without such a mark-up. In effect, what MWPC did was work behind the scenes to assure that the profit margin from this mark-up of local services was protected for its long-term California-based vendor.

In other cases, as well, rather than represent the interests of its client, MWPC seemed far more interested in pursuing the interests of its favored vendors. I had asked for the identity of vendors responsible for problems that caused personal injury or property damage, including the collapse of a temporary roofing structure, injuries caused by the after-party tent flooring, the disconnection of the permanent outdoor lighting system and the destruction of major components of the property's in-ground irrigation system. Rather than assisting me in pursuing these issues, MWPC has, instead, stonewalled and would not even provide the names of the relevant vendors. The impact of this stonewalling tactic was exacerbated by the discovery that MWPC had entered into contracts with some of its favored vendors that could be seen as an effort to insulate them from liability relating to our project without my knowledge or authority.

### MWPC Travel Costs

Based on its claim, it would appear that MWPC is intent on violating even its specific commitments to us. For example, a substantial element of MWPC's claim is for travel time, travel expenses or *per diems* for its principal and other employees coming from California. However, in inducing us to enter into its contract, MWPC specifically assured us, orally and in

5

writing, that travel for MWPC personnel for this Long Island, New York event would be treated as originating from New York City, not Los Angeles. That promise has been ignored in the invoices later received and in the current claim. Adding insult to injury, the MWPC claim even includes *per diem* charges for MWPC scouting trips when MWPC personnel were fed and, in at least one case, housed at our New York home. In any case, had these trips been properly accounted for as originating in New York City, no such *per diems* would have been billed at all, as these could have been a day trip from that base.

The *per diems* charged for MWPC staff on-site for the event weekend are also surprising since food was available to all the MWPC staff on each day they spent on site.

## Service Issues

The following represents several but not necessarily all our concerns with MWPC's event planning and coordination services. The following litany of failures, nonetheless, represents a serious indictment of the quality of those services.

### General Lack of Financial Discipline

As outlined above, although its contract certainly implies that MWPC had undertaken a fiduciary duty with regard to controlling the costs of the event, my repeated requests for any evidence of the exercise of such financial discipline have gone unanswered. Rather, the anecdotal evidence I have seen indicates that issues of cost and value were all but ignored by MWPC.

Let me give you one minor but typical example. Among the items in the wedding weekend guest bags were artisanal soaps. The bride identified a local vendor for MWPC and MWPC was charged with ordering a large quantity of these soaps. MWPC initially placed the order at the individual unit prices listed on the vendor's retail website. With one call by the bride, those costs were reduced by nearly half because of the volume of the order involved. However, MWPC had never bothered to make such a call to the vendor.

The lack of financial discipline also applied to larger vendors. The tenting proposal offered by MWPC was so outrageous in scope and cost that even its designated vendor expressed a degree of dismay. A complicated and costly outdoor air conditioning system was specified. However, the tent vendor correctly advised me against such a system because, in his experience, such a system was unnecessary in our climate and its only contribution to the event would have been unnecessary and disquieting noise. The local sanitation contractor has also told us that the specifications given by MWPC for its services were also massively out of proportion to the scale of the event.

6

**Budget Overruns**

MWPC's budgets also seem to have, whether intentionally or negligently, understated various elements of the cost of the event by considerable margins. For example, a cost estimate for moving furnishings from California to New York and back was provided by a vendor with whom MWPC had a longstanding relationship, hence knew well. We substantially reduced the amount of goods to be transported in an effort to reduce costs. Inexplicably, however, the amount invoiced (and now part of MWPC's claim) for transporting this reduced volume of goods substantially increased. This anomaly repeated itself over and over with other vendors.

Another area where MWPC failed to impose any financial discipline on vendors was with regard to local transportation costs. Despite our identifying vendors and securing bids for MWPC to consider well ahead of time, local transportation arrangements were not made until the last minute. And then, one of the vendors billed (and was apparently paid by MWPC) an invoice charging almost $300 an hour for its van rather than the $185 to $195 it had previously bid. It would appear, however, that no one at MWPC bothered to compare the vendor's original bids and its final invoices to resolve this unnecessary cost overrun.

*Revelry*

One unexplained charge in MWPC's claim is for *"Genie lifts for [the] Tent."* However, the tent rental people say they had no use for such machines because they supplied their own such equipment (and charged us for them). Thus, I can only conclude this must have been related to the furniture rental group (*Revelry*), but I cannot be sure because my question to MWPC on this issue has never been answered.

The *Revelry*-related expenses are a considerable issue in their own right. Despite repeated requests, we were unable to get complete visuals for the items being proposed by *Revelry* on a timely basis. When we were finally provided with photos or links to photos, we found that many of the *Revelry* products were either generic or inappropriate and should and could have been easily acquired from more local vendors. However, by then, it was too late to rely on such alternative sources.

In addition to the Genie lifts, we appear to have been separately charged for *Revelry*'s extra labor, travel and accommodation costs. *Revelry* had submitted a proposal that purported to list the complete costs of its services, including personnel, *per diems* and travel days, but that proposal seems to have failed to make any mention or estimate of these other not inconsiderable costs.

7

We were also charged for transporting *Revelry*'s goods across the country and back, an expense that could have been entirely avoided had we been afforded an opportunity to find an East Coast vendor or been presented with any less distant vendor alternatives. In addition, and as previously explained, the actual transport costs were considerably higher than budgeted, despite the amount of goods being transported having been reduced substantially from what was anticipated at the time the budget was prepared.

MWPC had promoted *Revelry*'s proposal for decorative trellises. *Revelry* had proposed our spending nearly a quarter of a million dollars on these temporary trellises. We found our own less custom but similar sized trellises at a local vendor and bought them. But they were never used. Having not bought the hyper-costly *Revelry* product that MWPC had recommended, the tens (instead of hundreds) of thousands of dollars in trellises that we purchased were never used. Apparently, such trellises were only useful if they were bought from one of MWPC's favored vendors.

Further, it appears that it may well have been the *Revelry* "designer" who ordered the construction of the temporary plastic rain shelter that caused our guests so much discomfort and damage as well as causing us embarrassment and potential liabilities. However, MWPC has refused to confirm whether, as suggested by other vendors, a *Revelry* executive was the source of this problem.

**Questionable Charges**

Some of the other items on the MWPC Ledger that appear to form the basis for its current claim also require explanation. I have asked for these explanations but have never gotten them. One of the biggest such categories is labor charges. As mentioned earlier, I repeatedly asked for a staffing chart showing who was on site, when, and for what purpose. I asked for this chart both before and after the event, but it was never provided, so I still do not know what all the people I saw at the site were doing or why I was housing so many of them at my expense.

There are other questionable charges shown on the MWPC Ledger that also appear to be part of its current claim. For example, there is a charge for a "photography room," when (i) the still photographer was housed at the event site residence, and (ii) the videographer billed separately for all its staff accommodations. As previously explained, there were also separate room charges for MWPC staff at the Southampton Inn despite the fact that MWPC staff was holding spare rooms that I paid for and were unused at that very same hotel.

MWPC also billed for walkie-talkies even though the MWPC staff knew that we had at least a half dozen Motorola walkie-talkie units, all tuned to the same channel/frequency, that were sitting ready on our kitchen counter, but that remained unused throughout the weekend.

8

## Mismanagement

MWPC mismanaged other aspects of the event. As noted earlier, MWPC personnel requested that prepaid hotel rooms be retained for the use of vendor personnel, but never made these rooms available to such vendor personnel (with the exception of the florist). The result was that the prepaid rooms went unused and I was billed for additional rooms for vendor personnel (including for the videographer, furniture rental group and lighting contractor). MWPC personnel also advised vendors of some of our decisions long after the fact, resulting in significant cancellation fees for services we had never agreed to accept in the first place, such as certain tent rental options, video services (an overnight edit) and beautician appointments. In some cases, we were charged cancellation fees for appointments we never authorized anyone to set up in the first place.

While MWPC took it upon itself to "produce" and coordinate the event, the caterer got little or no direction as to the timing of the wedding day event, with no "cues" from MWPC as to when the various courses should be served. The band got no "play list" or direction as to what music should be played when. The band did a great job of improvising but their improvisation was not what the bride and groom had planned for. The groom's parents were never told when they had to be wherever their presence was required.

There were other less severe but still notable problems. Heel protectors, known as *solemates*, were provided for the ladies. As we previously reported, most of them failed and, in at least a couple of cases, nearly caused embarrassing if not injurious falls. The bill for these defective items also appears to be a part of the MWPC claim. Under the circumstances, one would not have expected MWPC to pursue this charge.

### Pre-Wedding Day Coordination

MWPC provided little help to the bridesmaids in getting their dresses fitted. The bride had asked, several months ahead of time, to reserve a local salon she frequented for manicure/pedicure treatments for all the women in the wedding party. Instead, MWPC arranged serial appointments. However, when the bride and her mother arrived at the salon, they were told the bride's original plan could have arranged had the request been explained.

### Wedding Day Arrangements

The "dressers" selected by MWPC were entirely incompetent and the bustling of the bride's dress was left to her bridesmaids. As a result, several of the bridesmaids missed the entire

9

cocktail reception. . The dressers failed to put the "cookies" supplied with the bride's wedding dress into that outfit when bustling the dress, so it did not fit properly.

And, the wedding day schedule was thrown off by the fact that the dressers seemed to have forgotten to have the bride's change of dress and jewelry ready between dinner and the after-party

MWPC's claim also includes invoices for pressing suits, which never happened, and for helping the groom and groomsmen with their tuxedos, which was odd since none of them wore tuxedos. In fact, the only person assigned to help the men in the wedding party did not even know how to tie a tie. One would have expected an issue like this to be picked up by the event coordinator if it were really working to protect the interests of the client rather than of the vendors. Instead, these invoices have just become another part of MWPC's inflated claim.

During the wedding day itself, MWPC's care for the bride and her party was haphazard at best. As previously mentioned, no lunch was prepared for the bride or her attendants. They were left to scrounge for themselves in the residence kitchen – without finding much. When hors d'oeuvres were passed, very few made it up to where the bride's party was preparing. Despite the hours she spent in selecting the hors d'oeuvres, the bride barely got to taste them.

The groom's party was not treated much better. They also got no food brought to them in their preparation area or during the post-ceremony photo session.

Once the groom and his attendants had left the space where they were preparing for the ceremony, that room was to be used for the small children in attendance, but they too were forgotten. The bride and groom had selected a range of snacks, toys and DVDs to entertain the children, most if not all of whom had a close relationship with the bridal couple. No one ever brought the children the toys, DVDs or special food bought by the bride and groom for the children's use and entertainment. After the event, the bride found all of these items still in the same bags where she had left them for MWPC's staff to give to the children and their babysitters.

There had been considerable discussion of having a guest book at the event, a custom the bride's family maintains at each of their homes. While the book was available and shown to Ms. Weiss, it was never put out for anyone to sign.

**Food Issues**

The presentation of an anniversary cake to my wife and me at the reception was lovingly planned as a surprise for us by the bride and groom. The cake was prepared and available but the presentation did not occur. Someone had obviously dropped the ball on this element of the event.

10

In any case, the design of the cake was wrong, an issue acknowledged by the cake designer but blamed on poor or no communication from the MWPC staff charged with directing her.

Although the MWPC staff repeatedly promised they would preserve and freeze the top level of the wedding cake (as is customary), that was never done either. The remains of the wedding cake were simply left on a kitchen table to be picked over by whomever might be there.

As noted earlier, the hors d'oeuvres were not served in the rooms where the bridal party was preparing for the ceremony or the photo shoot afterwards, meaning that the bridal party mostly missed this very special element of their event. Ms. Weiss had told the wedding couple that, in her experience, one of the most common wedding oversights is that the bride and groom forget to eat on their wedding day. Ms. Weiss promised to save them from this common error and to make sure they got to at least try everything being served to their guests. Yet, the MWPC staff did nothing to follow up on this commitment.

The bride and groom had developed a set of special cocktails, including a drink served in an ostrich egg (the groom is from South Africa) and a special mint julep. No one on the MWPC staff even thought to bring either of these special drinks to the bride, groom or their attendants.

No one had passed on to the caterers a list – carefully prepared by the bridal couple – of the known vegetarians, so the caterer had no idea to whom special meals should be served nor at which tables the waiters should ask whether anyone might want that alternative.

The groom had purchased a quantity of special whiskeys to be brought to the under-tree bar after the reception for toasts with his special friends. These whiskeys were never brought to the bar. A lot of attention had also been paid to creating a Calvados & Cigar bar and an after-dinner Hot Chocolate and Brownie station. However, no one was directed to these spaces. They were poorly lighted, hard to locate and very sparsely attended.

**Paper Goods**

Ms. Weiss had tried to get us to use a particular printing service that she favored. After my wife chose another vendor for the wedding invitations, MWPC all but ignored the issue of the invitation text or insertions, resulting in the need for a costly second mailing detailing the wedding weekend's activities.

The invitations for the rehearsal dinner were never done at all, leaving many guests unclear as to whether they were even invited.

Other printed items were handled carelessly. We found innumerable mistakes in the program that were corrected at the last minute, but some items were still left off the menu cards. Place cards

11

were set for guests who had RSVP'ed "no," even though the RSVP spreadsheet was always available in real time to MWPC. That resulted in empty chairs and unnecessary last minute seating changes.

The MWPC claim includes various artwork charges. Several of the key designs (including the tree design on the program and the custom linen design) were created by my wife's assistants or the bridal couple themselves. However, these designs were not broadly utilized. We were not given any artwork or drafts of much of the paper goods for the wedding (such as the programs) until the week of the wedding. There seemed to have been little coordination and less follow up by MWPC with the printing vendors until the last minute. One result was a costly charge for expedited service that is also part of MWPC's claim.

The bride and groom had wanted most of the design work done by their respective sisters, both of whom have considerable talent in this area, but they were prevented from doing so by the lack of earlier attention to any of the design issues.

**Photographs**

The bridal party had entrusted MWPC with their "shot list" for the wedding photographer. The list specifically included photos with their two puppies (who had been in the bridal party) after the ceremony. That was not pre-arranged and the logistics became all but impossible. The list also included photos to be taken under a romantic weeping beech tree on the property that had been very meaningful to the bride when she was growing up. In the excitement of the moment, the bride forgot her request and no one reminded the couple or the photographer of this element (or any other) on the bridal couple's "shot list."

The wedding plan included a video booth where guests could tape messages for the bride and groom. The MWPC staff was told to announce where it was and guide people there. That never happened. Although several guests asked, no one was told where the booth was located. It appeared that most of the MWPC on-site staff did not even know. As a result, very few guests (and no one in the wedding party) were able to find it on their own and this costly resource went sadly and irretrievably underutilized.

**Guest Bags**

The bride had a timeline for doing the guest bags and taken great care in the design and preparation of the guest bags. It would appear that MWPC took somewhat less care. The bags were assembled so late that the bride was virtually excluded from the process, despite her repeatedly expressed intention to be a part of this process. A number of the bags provided were defective, a fact not communicated to us at the time. And, several of the guest bags were not delivered to their intended recipients during the event weekend. We only discovered these

12

undelivered guest bags after most of the guests had left. As a result, these guest bags had to be sent to their intended recipients by Fed Ex after the event.

Each of the guests was supposed to have gotten a jar of applesauce from the bride's orchard when they left the reception. Instead, the early leavers got as many as they wanted and the people who left late got none at all.

MWPC's selected vendor tried to do a design for the tee-shirts going into the guest bags but she could not duplicate two simple national flags. The groom then took it upon himself to do the design. Nonetheless, MWPC's claim still includes an "art" charge for the tee-shirts. The MWPC claim also includes the charges for the tee-shirts themselves. This is another example of where, rather than consulting with us as to the choice of vendor or using a local vendor we have relied on for years, MWPC used a California vendor that charged a fifty percent higher unit price than the local vendor and necessitated significant transport charges. The story of the soaps for the guests bags, explained earlier, was very similar except that, in the case of the soaps, the bride herself exercised the necessary simple diligence required to get a fair price.

**Wedding Night Arrangements**

No arrangements were made to get the bride and groom to their hotel after the reception, leading to a last minute call by the groom to a local cab service. Because the taxi only took cash for its fares and no prior arrangements had been made, the couple had to borrow money from the hotel desk to pay for their ride.

MWPC made the reservations for the bridal couple's wedding night stay at a well-known local inn well in advance. Nonetheless, the hotel where the couple was staying for their wedding night was never advised that they were a just married couple, a circumstance for which the hotel would usually make some special accommodations. Nor did MWPC make any effort to make the room special, with champagne, flowers or any of the other accouterments usually accompanying such an occasion. On the wedding night, the couple had to step out of a taxi and walk through the rain into a hotel obviously unprepared for their arrival.

**Lost Items**

MWPC staff had promised to collect the unique and costly table name cards once everyone was seated and then forgot about that task, as a result of which most were lost.

MWPC had assured us that, once people had finished dinner and gone to the dance floor, the hand-embroidered napkins on the tables would be collected. That never happened, so many of these napkins went home with the guests or staff. The same happened with regard to some of the special paper goods the bride wanted to keep. As a result, a significant number of these items

13

were irretrievably lost. The specially printed pillows were also to be collected and then given out to the guests as they left to assure that each guest got one pillow. That did not happen either, so many guests took multiple pillows, some appear to have been taken by staff and several guests were left without this intended keepsake from the event. The groom's family's entire package of event souvenirs, left in the MWPC on-site office, was lost as well.

## Music

While the band was quite capable, we had been misled as to the band contract by MWPC's staff. We had been led to believe that we would have a certain number of hours of musicians' time to allocate – only to find out that we did not. This misunderstanding caused last minute confusion, stress, and an unanticipated budget overrun.

When the bridal couple came to the reception tent to practice their first dance, *Revelry* was still setting up and did not want them to use the space. The groom had repeatedly asked MWPC staff to tell him when the band was doing their sound check for the reception so he could walk through, with them, the entrance and first dance routine. That meeting never happened. As a result, this critical element of the music was not performed as planned or desired.

Despite very specific instructions from my wife, the musicians set up a brightly colored canopy at the ceremony. This bright blue canopy was completely out of keeping with the event's design criteria. That problem was only solved at the last minute by the fortuitous fact that I happened to have a spare canopy of the proper color in my garage (which I use at car shows). My wife instructed this canopy be used as the only available and acceptable substitute.

## Lack of Obvious Contingency Planning

In fact, the overall contingency planning for a rain day event was completely inadequate and ultimately became dangerous. Very few umbrellas were on hand. A plastic sheet was placed amateurishly over two open porch areas being used for drinks (despite a warning from the tent professionals on site that this construct could be dangerous). We believe this dangerous installation was ordered by one of MWPC's California-based vendors, who must not have known much about rainwater and how it collects. Not surprisingly, these temporary covers collapsed, soaking several guests, destroying some very expensive suits and dresses and causing at least two guests who had travelled thousands of miles to attend the wedding to have to leave even before the reception.

On a less dangerous front, the wedding party (especially the groom's party) was not kept advised as to the weather delays for the ceremony and how the inclement weather was being handled. While MWPC repeatedly assured me that, with all their staff on-hand, there would be no weather

14

damage to any of the rental furnishings, MWPC now proposes to charge us a rather exorbitant $1,200 for just such damage to two chairs.

## The Rehearsal Dinner

There also seemed to have been no advance planning for the possibility of inclement weather at the Friday evening rehearsal dinner. The MWPC staff appeared to be standing by helplessly as guests scrambled up from the beach without umbrellas as it began to rain. There seemed to be no plan for moving the party indoors, although the risk of rain was obvious. And, the MWPC staff stood idly by as the few security people and I tried to find a way to cover a number of open cars parked on the forecourt. And, the lack of a plan resulted in much of the food on-site being ruined halfway through the event, with the disastrous results condemned to a hiding place in the basement.

The bride was also badly served at this event. No one from WMPC's team was available to get her a drink or any of the desserts being served after the rehearsal dinner while she was being surrounded by guests. And, no one was available with an umbrella to help her from the beach back up to the house when the rain began, resulting in serious damage to the fragile material of her very costly *Oscar de la Renta* dress.

## After-Party

Although MWPC would not tell us, we did learn that Stamford Tent installed the dance floor in the after-party tent. As noted, that floor resulted in a number of falls, scrapes, bruises and damaged outfits. Sadly, it also resulted in a real injury to one of the bridesmaids that may ultimately involve significant liability. We advised the vendor of this potential claim. We got two responses. First, we were told that Stamford tent had been fully indemnified by MWPC. That would seem to mean that MWPC will be liable for any damages the victims may pursue against us or Stamford Tent.

Stamford Tent also explained why the problems with the dance floor in the after-party tent arose. The vendor explained that it was asked for the first time, on the morning of the wedding, to install the dance floor. The vendor was told that a prior vendor had backed out at the last minute and that the floor had to be built from immediately available materials before the wedding ceremony began at 4pm the same afternoon. The vendor was also told that the ground where the dance floor was to be installed was flat and stable. Both statements proved to be inaccurate. Given the time frame, the vendor was unable to do its own usual level of diligence on the site conditions or to bring in the optimal material. The vendor installed a temporary wood floor but the ground was not flat and, as rain made the ground soggy, it also became less stable. The tent vendor also got this order too late to arrange for adequate additional maintenance resources. No one from MWPC seemed to be monitoring the deteriorating condition of the floor or trying to

mitigate the increasingly dangerous conditions it presented, other than by suggesting that it was time for guests to go home.

The floor buckled as more people came to dance and environmental conditions deteriorated. The problem was exacerbated by the fact that, being in an open-sided tent, the floor became increasingly dirty, wet and therefore slippery. It ended up just an accident waiting to happen. In retrospect, it seems clear that had the arrangements for the tent floor been made on less than a few hours notice, each of the problems that arose in the installation, including providing a more stable base and arranging for better weather protection, could have been more easily accomplished.

**Sunday Brunch**

The MPWC contract (¶2) called for there to be "three experienced and qualified representatives from MWPC from the commencement of the event to the completion" and specifically identified one of those representatives as Ms. Weiss. The event clearly included the Sunday brunch, which had been planned to be part of the festivities from the inception. Nonetheless, come Sunday morning, Ms. Weiss was nowhere to be found.

No MWPC staff was present to assist the bridal couple or to get them any food as they tried to visit with each of their guests at the brunch. Helping the bridal couple should have been a key function of the event planners but no effort was made in that regard by whatever junior staff MWPC had left in place.

The food vendors, so carefully selected by the groom, were told to pack up and leave before anyone in the wedding party was warned. As a result, many guests and several members of the wedding party, including the bride and her mother, never even got to sample many of these vendors' offerings. MWPC had told the food trucks to leave the property at 3 pm on Sunday without consulting us, despite the fact that some of the trucks were more than willing to stay on and we would have liked them to do so.

**Broken Promises**

MWPC's contract (¶3) called for it to plan and coordinate a "welcome party," which never happened. The bride's and bridesmaids' lunch on the schedule for the wedding day was forgotten. The only help MWPC gave on the prior Thursday's bridesmaids' luncheon was to help write some place cards. Thousands of dollars of fine linens created for the wedding by my wife's company were nearly lost when MWPC wrongly insisted they had been left on site. Fortunately, my wife finally found these items with the caterer. A white runner that was to be installed on the ceremony sisal carpet never appeared.

16

While MWPC said they were accustomed to having parties last all night and could accommodate that schedule, the entire staff left the property well before many of the guests on the evening of the reception. MWPC was pressuring guests to end the after-party earlier than they clearly wanted. One MWPC staffer even had the audacity to tell the bride and groom that they should leave their own party because "it was past her [the staffer's] bedtime."

The MWPC staff also disappeared well before the breakdown of the site was completed, with MWPC unilaterally amending my contract with the local security vendor by instructing that vendor that his staff had to take over supervising the breakdown of the site.

### After the Event

Despite my wife having been assured that a wooden bar in place under a specimen tree would be kept in place for the Sunday brunch, it was broken down and removed on Sunday morning. And, when I tried to stop the removal – including by offering to buy the piece – I was informed that the entire unit was already on a truck on its way back to California.

The bride asked MWPC staff to give her the list of where each guest was seated. The objective was to confirm who actually attended and to assist guests in following up with people they met at the event. She is still waiting for that list.

In addition to not giving the bride information she had requested, MWPC received many of the files the bride had assembled in planning her wedding. However, MWPC has never returned most of those files, despite being asked to do so.

### Misrepresentations

On a more conceptual basis, in hiring MWPC, we were assured that Ms. Weiss would be devoting her attention to this project because it was the only event MWPC would be staging in the month of June. That representation turned out to be utterly false, as we learned later from MWPC's own social media. As a result, our project did not get the attention it deserved. And, the heavy schedule that MWPC actually had for June may well have contributed to the late deliveries of documents, budgets and information as well as to the lack of attention to detail I have noted.

Perhaps MWPC's busy schedule also had an effect on Ms. Weiss's promise to have weekly conferences with the bride during the year-long run-up to the wedding. That turned out to be just another sales pitch and one more unmet MWPC promise. MWPC's commitment to have weekly phone calls and monthly (and bi-weekly as the date got closer) meetings in New York with the bride or her mother turned out to be an equally empty promise.

The last minute after-party dance floor, the lack of contingency planning for rain, the lack of coordination with the caterer and band, the lack of any planning for the wedding night accommodations and any number of similar events suggest a serious lack of advance planning. We had not expected such last minute solutions from a well-known event planner that had more than a year to prepare for the event. It may have been that MWPC had simply over committed and their need to solve problems on the run was the result. But, whatever the reason, the result was seriously disappointing. A wedding is stressful enough without having the feeling that critical decisions are being made on the fly and at the last minute.

Also troubling were the MWPC team's constant efforts to fit our event into a generic model that suited their favored long-term vendors and their timeline. Although assured that our event would be customized to our more conservative and local taste, we ended up with an event that was a far more costly West Coast style "corporate" product than we had wanted.

**Threats to Vendors**

After it became clear that we had disagreements with MWPC, MWPC tried to use its commercial leverage to quash any potential complaints. It tried to block the tent rental vendor from paying us an agreed refund. Other vendors have reported that they could not cooperate with our attempts to audit or investigate the management of the event because MWPC provided them with a lot of work and had suggested that such cooperation could endanger that flow of business.

MWPC's most blatant abuse was more current. I recently discovered that a member of MWPC's staff has tried to convince the videographer to refund our payment and, instead, to sell MWPC the raw footage he took at our event. It is hard to understand this gambit except if it were an attempt to ransom this unique and highly personal property. If so, this plan would represent a really cruel and unethical way of dealing with this commercial dispute that was bound to escalate it into something far worse, with an innocent vendor caught in the middle.

<u>**Contractual Limitations on Liability**</u>

MWPC's contract does include various provisions concerning its potential liability. For example, the contract (¶5) recites that "MWPC assumes no responsibility in any way for any negligence, non-performance or other misconduct by hired vendors." However, that exculpatory language assumes such vendors are hired in the manner described in that very same ¶5, meaning that the vendors would have to be hired by the client rather than MWPC. And, any indemnities or limitations of liability offered to the contractor would have to have been reviewed and approved by the client. So, at least with regard to vendors not contracted by me or with regard to any indemnities or limitations of liability offered by MWPC without my approval, it would seem that this limitation on liability would not apply.

Another section of the MWPC contract (¶6) explains that "MWPC assumes no responsibility for damages and losses incurred by the Client or Client's guests or attendees at the event." However, since hiring vendors is a task committed specifically to the client, MWPC had no capacity to extend this protection to any other vendors. Nor did it have a right independently to enter into contracts incorporating such limitations for the benefit of other vendors without my "review and approval." Accordingly, this language would also not protect MWPC from liability to guests injured or damaged by problems such as the collapsing temporary plastic porch covering, defective dance floor or inadequate event lighting caused by any of the vendors with whom it had contracted and to which it had offered indemnities or limitations of liability, in actions that exceeded its authority under its consulting contract.

In addition, to the extent that MWPC took it upon itself to extend indemnifications to contractors working on the site, without my approval, MWPC would have effectively substituted itself for those contractors in terms of liability by exceeding the scope of the authority it had under its consulting agreement. Its agreement to indemnify its vendors was a separate agreement with them, entirely separate from its consulting agreement with me, hence not subject to the limitations of liability in that agreement with me.

Thus, for example, if the guest who was injured in the after-party tent were to pursue her claim, I would ordinarily turn to Stamford Tent to resolve that matter since Stamford Tent installed the floor that appears to have caused her injury. Accordingly, we have notified Stamford Tent of the potential claim. However, Stamford tent insists that they have been fully indemnified by MWPC and suggested that, as a result, we should look to MWPC instead. Since MWPC offered this indemnity outside the scope of its consulting contract and without my review or approval, the limitations on its liability contained in that contract would not apply. Thus, it would be MWPC that would be liable without limitations to the injured guest.

As my consultant, MWPC also had an obligation to assist rather than frustrate me in pursuing any claims I might have had against any of the vendors. It has refused to do so, vitiating whatever limitations ¶6 of the MWPC agreement might otherwise have provided.

The same section ¶6 also warns that "Client [shall] pay for any and all damages arising out of the event, except to the extent of any negligence or misconduct by MWPC, its employees or agents." I would submit, however, that damages arising from the work of vendors hired by MWPC in a manner blatantly inconsistent with its obligations under ¶5 of its contract would certainly constitute damage arising from "negligence or misconduct." Certainly, offering indemnities or limitations of liability to vendors not reviewed or approved by MWPC's client would be such misconduct. Hence, it would seem that, under ¶6 of the MWPC agreement, damage caused by the negligence of any vendors that MWPC has claimed to be its agents on site or to which it extended unauthorized indemnities or limitations of liability would also be outside this exculpatory language. And, there was damage. The property's irrigation system suffered about

19

$10,000 in damage (mostly due to trucks driving over the lawn unsupervised), the permanent on-site garden lighting system which was messed around with by the California-based temporary lighting consultant hired by MWPC was also damaged, several guests were harmed by the negligent installation of the plastic covering over the porches and at least one guest was injured as a result of the defective after-party dance floor installation.

To the extent that MWPC chose unilaterally to extend its mandate from that of a consultant to that of general contractor, its role as a general contractor in securing, supervising and paying subcontractors for services would not seem to be within the ambit of the portions of ¶¶5 and 6 of the MWPC contract intended to limit its liability as a consultant.

Finally, the MWPC contract (¶8) provides a monetary limit on MWPC's potential liability for damages. It says that, "in no case, shall MWPC's liability exceed the amount paid by Client under this Agreement." Since MWPC has already been paid $72,508 and is now demanding an additional payment of $330,184.46 as due under its contract, it would appear that MWPC's potential liability would be limited to $402,692.46 under that clause of its contract, to the extent it applies at all.

### Summary

Given the number of issues that have arisen and, in a good faith attempt to find a fair resolution, I had proposed to MWPC that we enter into a process of voluntary mediation with the assistance of a professional commercial mediator. MWPC's response was apparently your letter and the implied threat of litigation. If that is the course your client has chosen to pursue, I am more than willing to oblige.

Sincerely,

Bernard J. Carl

By email to: *g.johnson@cancollects.com*

20